# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JONNIE CROCKETT, III,

                                       **Case No. 2:16-cv-852**

    **Petitioner,**                       **Judge Michael H. Watson**

                                         **Magistrate Judge Chelsey M. Vascura**

    v.

WARDEN, MADISON
CORRECTIONAL INSTITUTION,

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the *Petition* and *Brief in Support*, Respondent's *Return of Writ,* Petitioner's *Reply,* and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

### Facts and Procedural History

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> On February 12, 2012, Whitehall Police Officer Jerry Dillon responded to a report that an eight-month-old child was not breathing. As he approached the reported location of the incident, a woman waved at him and then ran inside an apartment. Officer Dillon ran after the woman into the apartment, in which he found a man, later identified as appellant, kneeling over a child who was wearing only a diaper, had vomit coming out of the right side of his mouth, and appeared to be "lifeless." (Tr. 39.) Upon noticing that the child was not breathing and did not have a pulse, Officer Dillon began performing chest compressions while simultaneously alerting medical personnel to the situation. A firefighter responded to Officer Dillon's report and told him to bring the child outside, as a medic was arriving on the scene. Officer Dillon ran outside and delivered the child to the medics.

Whitehall Police Officer Anthony Fields also responded to the incident on February 12, 2012, arriving seconds after Officer Dillon. After Officer Dillon ran out of the house and delivered the child to the medics, Officer Fields remained at the apartment, where he spoke with the child's father, whom he identified as appellant. According to Officer Fields, appellant stated that the child's mother left the child in appellant's sole care while she left the apartment to go to the store. Appellant placed the child in a playpen and covered him with a blanket. Appellant later checked on the child, whereupon he noticed that the child was not breathing. Appellant took the child out of the playpen, removed the child's clothes, splashed water on the child's face, and began blowing in his mouth in an attempt to resuscitate him while he contacted the mother by phone. Appellant stated that the child had no prior health problems. Upon examining the apartment, Officer Fields noticed what appeared to be vomit in the bathroom sink.

Doug Neighbarger, a paramedic and firefighter employed by the City of Whitehall Division of Fire, also responded to the report of a child having difficulty breathing on February 12, 2012. Within two minutes of being dispatched, he arrived at the scene, received the child, whom he identified as I.C., outside from a police officer, and proceeded to the hospital. En route to the hospital, Neighbarger and three other paramedics, who were in the back of the ambulance with I.C., began working to revive him. I.C. did not have a heartbeat and was not breathing but had no noticeable external injuries. Neighbarger noted that he had a dirty diaper and vomit on his face. The paramedics were able to restore I.C.'s heartbeat through CPR and delivered him to the emergency room at Nationwide Children's Hospital approximately 30 minutes after being dispatched.

Dr. David Rogers, a pediatric ophthalmologist at Nationwide Children's Hospital, examined I.C. on February 12, 2012 around 7:30 p.m., and identified 15 to 20 retinal hemorrhages in the back of the left eye and 1 retinal hemorrhage in the back of the right eye. Dr. Rogers testified that "retinal hemorrhages can happen in all kinds of situations and diseases" but that "their location * * * both within the retina and throughout the eye can be very diagnostic of what actually caused them." (Tr. 133–34.) He indicated that I.C.'s injuries were similar to those found in patients who had been in a fatal single impact motor vehicle accident or had fallen from a multiple story building but that the injuries were inconsistent with a short fall, such as from a bed or couch. Because the hemorrhages were located around the optic nerve and along the blood vessels, and there was no other sign of physical trauma to

the eye, Dr. Rogers found that abusive head trauma was a potential cause of I.C.'s injury. Based upon I.C.'s history and the lack of other potential causes for the specific injury to I.C.'s eyes, Dr. Rogers concluded that the injury resulted from abusive head trauma.

Dr. Rogers stated that "[t]here is absolutely no indication from this eye exam that I performed and which is documented photographically there is any possibility that this could be related to increased pressure in [I.C.'s] brain." (Tr. 141.) Dr. Rogers stated that the number, type, and location of the hemorrhages in I.C.'s eyes were inconsistent with an increase in intracranial pressure. Dr. Rogers sought further testing to determine whether I.C. had a bleeding disorder and noted that, if bleeding disorders were not found, then nonaccidental trauma should be considered as a potential cause of I.C.'s injuries. However, Dr. Rogers stated that the types of hemorrhages in I.C.'s eyes were not consistent with a bleeding disorder. Dr. Rogers also stated that he had seen retinal hemorrhages caused by CPR but that the hemorrhages found in I.C.'s eyes were inconsistent with those caused by CPR based upon studies of CPR performed by trained professionals and first responders in the community.

On February 14, 2012, Dr. Lisa Martin, a pediatric radiologist at Nationwide Children's Hospital, examined an MRI of I.C.'s cervical spine, which is the area from the bottom of the skull to the shoulders, and I.C.'s thoracic spine, which is located near the chest of the patient. Dr. Martin found abnormal fluid in the cervical spine, which indicated a ligament injury. Dr. Martin indicated that this injury resulted from "significant force," such as in a motor vehicle accident or a similar whiplash-inducing event, or in the event of a fall from a third-story window or a tall tree. She also found relatively acute or recent compression fractures in I.C.'s seventh and ninth thoracic vertebrae, which are located approximately in the middle of the back. Dr. Martin stated that I.C.'s injuries could not have occurred while he was laying flat on his back, as would normally be the case if someone was performing CPR on him. Dr. Martin testified that I.C.'s injuries were consistent with either accidental or nonaccidental trauma but that she could not infer more based upon the radiological exam.

On February 12, 2012, Dr. Brent Adler, a pediatric radiologist at Nationwide Children's Hospital, reviewed a portable chest x-ray of I.C. which was completed in the emergency department shortly after he arrived at the hospital. Based upon the initial chest x-ray, Dr. Adler was unable to find any problems with I.C.'s lungs and

did not observe any fractures at the time. Next, Dr. Adler reviewed a lateral cervical spine film to ascertain whether the bones in the neck were properly aligned and found no abnormalities. Dr. Adler then reviewed a CT scan of I.C.'s head and found acute hemorrhages in the subdural area of the brain that had begun "within the last couple of days." (Tr. 269.) Dr. Adler stated that the kind of "relatively forceful bleeding" he observed in I.C.'s case reflected "some sort of trauma that caused tearing of the veins around the brain," resulting from events such as "car accidents, falls from great heights, nonaccidental trauma, or child abuse," or that it could happen if a person had a "propensity to bleeding." (Tr. 270–73.) Also, on February 12, 2012, Dr. Adler reviewed an abdominal CT scan performed on I.C. and found a three and one-half centimeter laceration of the liver and a pattern that suggested shock bowel. Dr. Adler stated that he had read about instances where liver lacerations resulted from CPR, but he had never seen it happen.

On February 13, 2012, Dr. Adler conducted a skeletal survey on I.C. and found no fractures. On February 14, 2012, Dr. Adler reviewed the skeletal survey again and, based upon Dr. Martin's review of I.C.'s MRI, identified fractures of I.C.'s spine that he had initially not seen. Dr. Adler concluded that I.C.'s fractures were consistent with the bleeding he observed in I.C.'s brain and that such injuries could result from a large amount of force that flexed the body forward. On March 15, 2012, Dr. Adler reviewed another CT scan of I.C.'s head and observed extra fluid outside of the brain which indicated that the brain was shrinking as cells in the brain died. Dr. Adler indicated that the evolution of the injury to I.C.'s brain suggested that, "because the brain looked so normal on the initial study, * * * the injury must have been shortly before the initial study" on February 12, 2012. (Tr. 328.)

Dr. Nicholas Zumberge, a pediatric radiologist at Nationwide Children's hospital, performed the first MRI of I.C.'s brain on February 13, 2012, which showed swelling and cell death occurring in the brain. Based upon the increase in the amount of fluid around the periphery of the brain between the time of the initial head CT scan taken on February 12, 2012 and the MRI on February 13, 2012, Dr. Zumberge concluded that the injury likely occurred within hours or a day of the initial CT scan. Dr. Zumberge also stated that a hypoxic ischemic injury, namely an injury involving cell death resulting from a lack of oxygen, was not consistent with the subdural hemorrhages found in I.C.'s brain.

Based upon I.C.'s medical history, Dr. Zumberge concluded that it was "difficult to explain or nearly impossible to explain" I.C.'s injuries, specifically "retinal hemorrhages, subdural hemorrhages, and diffuse brain injury," in any manner other than "child abuse or nonaccidental trauma or abusive head injury, whatever term is used." (Tr. 432.) Dr. Zumberge also pointed to the liver laceration, shocky appearance of the bowel, compression fractures of the seventh and ninth thoracic vertebrae, and edema in the ligaments of the upper neck as evidence raising a suspicion of child abuse. Dr. Zumberge conceded that, although "there's a chance that this wasn't abusive injury or a traumatic injury, * * * when it comes to the [injury to the] neck, I don't know what else this could be." (Tr. 438.) Dr. Zumberge asserted that I.C.'s injuries were "the result of significant trauma with a pattern that is very suggestive of abuse, and a trauma that is not compatible with trauma that would occur during aggressive or vigorous resuscitative effort." (Tr. 441.)

Dr. Bhuvana Setty, a pediatric hematologist and oncologist at Nationwide Children's hospital, reviewed I.C.'s lab results and determined that he did not have an underlying bleeding disorder.

On February 12, 2012, Detective Steve Brown of the Whitehall Police Department interviewed I.C.'s parents at Nationwide Children's Hospital. I.C.'s father, whom Detective Brown identified as appellant, stated that I.C. fell from a bed about three days before February 12, 2012. Detective Brown later examined the bed that appellant claimed I.C. fell from and found that the bed was 18 inches from the floor, which was carpeted. According to Detective Brown, appellant claimed that I.C. was in good health with no apparent problems before the morning of February 12, 2012, when he stopped breathing. Appellant stated that he took I.C. out of bed that morning and that no one else had contact with I.C. until after he stopped breathing. After I.C. stopped breathing, appellant called I.C.'s mother, who was away from the home at a store. When she returned home from the store, I.C.'s mother called 911.

Dr. Mary Ranee Leder, attending physician in the Child Advocacy Center at Nationwide Children's Hospital, whose duties included assessing children in response to reports of potential sexual assault or child abuse, was responsible for examining I.C.'s case in this capacity. After beginning an examination of I.C.'s case, she was able to obtain a timeline of I.C .'s condition through speaking with his parents. According to Dr. Leder, both parents affirmed that I.C. was well the night before being admitted to the hospital and that, when I.C. awoke at 11:00 a.m. on February 12, 2012, appellant removed him from bed and placed him on his abdomen in bed

while appellant played video games. At that time, I.C.'s mother observed that he appeared well, and then she departed the home to go to a store. After some period of time, appellant checked on I.C., at which point he noticed that he was not breathing. Appellant stated that he splashed water on the child and attempted resuscitation by beating on the child's chest with a closed fist, which he demonstrated for Dr. Leder. When the child did not respond, appellant called I.C.'s mother, who left the store, arrived home, and then called 911 for help.

Dr. Leder stated that I.C.'s injuries were inconsistent with a fall from a bed at a height of 18 inches onto a carpeted floor, as described by I.C.'s parents. Dr. Leder conducted a physical exam of I.C. and noted only minor external injuries. On February 13, 2012, Dr. Leder observed a subdural hemorrhage on the right side of I.C.'s brain and a three-centimeter liver laceration in her review of I.C.'s head CT scan, abdomen and pelvis CT scan, and skeletal survey, which she performed in conjunction with a pediatric radiologist. Dr. Leder stated that bleeding on the surface of the brain, like what she observed in I.C.'s case, could be caused by "repetitive acceleration/deceleration of the type seen with shaking, with or without impact," and that such shaking would be "vigorous shaking of the type where a reasonable caregiver observing it would say that this is an inappropriate way of handling an infant." (Tr. 623–24.) Dr. Leder stated that the ligament injury in I.C.'s neck and the compression fractures in the seventh and ninth thoracic vertebrae could be caused by repetitive acceleration and deceleration or vigorous shaking. Dr. Leder also discussed the intra-retinal hemorrhages in I.C.'s eyes with Dr. Rogers, who concluded that, having ruled out an underlying bleeding disorder, I.C.'s intra-retinal hemorrhages were consistent with nonaccidental trauma.

Based upon her review of I.C.'s condition, his history, and her discussions with other physicians, Dr. Leder concluded that "the subdural hemorrhages, the retinal hemorrhages, and the vertebral fractures were unexplained" and that "[t]here was no medical condition" or "accidental history that would be explaining [the] presence of these findings" and, therefore, "these findings were consistent with nonaccidental trauma." (Tr. 643.) Dr. Leder stated that the trauma and injury to the brain resulted in difficulties with breathing and the subsequent lack of oxygen to vital organs, rather than a lack of breathing causing the injuries. She stated that her findings allowed for "the possibility, however remote, that the liver laceration could have been caused by [appellant's] reported resuscitative efforts." (Tr. 621.)

Dr. Charles J. Lee, a deputy coroner and forensic pathologist at the Licking County Coroner's Office, performed an autopsy on I.C. after he died on December 14, 2012 while at a nursing facility specifically for children. Prior to death, I.C. was in a coma with no voluntary movement for several months. Dr. Lee testified that I.C. was a normal weight and length for his age of 18 months at the time he died and that there were no apparent external injuries. Upon undertaking an internal examination, Dr. Lee found that I.C.'s feeding tube had become dislodged from his stomach and that fluid was leaking into his abdominal cavity. Dr. Lee testified that I.C. died as a result of irritation resulting from the fluid in his abdominal cavity and peritonitis, which he defined as "inflammation of the bowel as well as the irritation of the heart causing it to rapidly beat and then misbeat and beat irregularly and then not beat at all." (Tr. 703.) He concluded that I.C.'s cause of death was "complications of the peritonitis because of the fluid that was leaking into his belly secondary to him being in a chronic comatose state secondary to the head trauma" and that the manner of death was homicide.

Dr. Lee testified that, although I.C. was otherwise in very good health, his brain was small compared to the size of his skull, and that it weighed about one-third of a normal healthy brain for an average, healthy 18–month–old male. Because I.C.'s brain was about the size of a newborn's brain and much smaller than his skull, Dr. Lee concluded that I.C.'s brain regressed or shrank as a result of injury and death to the tissue. Dr. Lee found I.C.'s injuries to be consistent with abusive head trauma and a lack of oxygen from a significant global trauma affecting the entire brain at once. Dr. Lee found that there were no skull fractures present in I.C.'s case, but there was evidence of a subdural hemorrhage. Dr. Lee stated that bleeding in the brain was inconsistent with a sudden cessation of breathing unless there was trauma to the brain. Further, he stated that the injuries found in I.C.'s brain were inconsistent with sudden infant death syndrome ("SIDS") or short falls.

At trial, appellant called Dr. Thomas W. Young, a forensic pathologist in private practice, to testify. Dr. Young formerly served as a medical examiner for the state of Georgia, and then as the Chief Medical Examiner for the counties of Jackson, Platte, Clay, and Cass in the state of Missouri. Dr. Young reviewed I.C.'s records and testified that, when the flow of oxygen is restored to the brain after a period of deprivation, the brain will become swollen and that blood vessels will leak resulting in subdural

hemorrhages. He also stated that swelling in the brain can increase pressure in the veins in the backs of the eyes, causing retinal hemorrhages. Dr. Young further stated that performing CPR on an infant can result in a liver laceration.

Dr. Young stated that I.C.'s condition was consistent with a condition called an apparent life-threatening event, which he defined as an instance where a child suddenly stops breathing, similar to SIDS, but is resuscitated. Dr. Young disagreed that abusive trauma in the form of shaking could cause the types of injuries found in I.C.'s case, including ligament injury and vertebral fractures.

On March 6, 2012, a Franklin County Grand Jury indicted appellant on one count of felonious assault in violation of R.C. 2903.11, a felony of the second degree, one count of endangering children in violation of R.C. 2919.22, a felony of the second degree, and one count of endangering children in violation of R.C. 2919.22, a felony of the third degree. On March 26, 2013, a Franklin County Grand Jury indicted appellant on one count of murder in violation of R.C. 2903.02. On July 1, 2013, the state filed a motion for joinder of the indictments into a single action for the purposes of trial.

On February 4, 2014, a jury found appellant guilty of felony murder and the two counts of endangering children; the jury found appellant not guilty of the sole count of felonious assault. On February 27, 2014, the trial court sentenced appellant as follows: life imprisonment with the possibility of parole after 15 years, to be served concurrently with both a sentence of three years as to the felony two count of endangering children and a sentence of 18 months as to the felony three count of endangering children. Appellant timely appealed.

II. Assignments of Error

Appellant appeals assigning the following four errors for our review:

[I.] THE TRIAL COURT ERRED WHEN IT ENTERED A JUDGMENT AGAINST THE APPELLANT WHEN THE JUDGMENT WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

[II.] THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT THE DEFENDANT'S MOTION FOR ACQUITTAL AS

THE GUILTY VERDICTS AT THE TRIAL COURT WERE
NOT SUPPORTED BY SUFFICIENT EVIDENCE.

[III.] THE TRIAL COURT ERRED IN REFUSING TO
INSTRUCT THE JURY ON THE LESSER–INCLUDED
OFFENSE OF INVOLUNTARY MANSLAUGHTER.

[IV.] APPELLANT RECEIVED INEFFECTIVE ASSISTANCE
OF COUNSEL TO A DEGREE THAT APPELLANT DID NOT
RECEIVE A FAIR TRIAL.

*State v. Crockett*, Nos. 14AP-242, 14AP-248, 2015 WL 3757336, at *1-7 (Ohio App. 10th Dist.

June 11, 2015).  On June 11, 2015, the appellate court affirmed the judgment of the trial court.

*Id*.  On December 16, 2015, the Ohio Supreme Court declined to accept jurisdiction of the

appeal.  *State v. Crockett*, 144 Ohio St. 3d 1428 (2015).

On August 21, 2015, Petitioner filed an application to reopen the appeal pursuant to Ohio

Appellate Rule 26(B).  (ECF No. 7-1, PAGEID # 315.)  On November 5, 2015, the appellate

court denied his Rule 26(B) application.  (ECF No. 7-2, PAGEID # 411.)  Petitioner apparently

did not file an appeal to the Ohio Supreme Court.

On October 7, 2015, Petitioner filed a delayed motion for a new trial and a motion for

new trial based on newly discovered evidence.  (PAGEID # 417, 421.)  On December 4, 2015,

the trial court denied the motion for a new trial for failing to present newly discovered evidence

and rejected Petitioner's claim of ineffective assistance of counsel as barred under Ohio's

doctrine of *res judicata.  See State v. Crockett,* Nos. 15AP-1149, 15AP-1152, 2016 WL

6464937, at *1 (Ohio App. 10th Dist. Nov. 1, 2016).  Petitioner raised the following assignments

of error on appeal:

[I.] The trial court abused its discretion and erred in denying
appellants motion for leave to file delayed motion for new trial,
Thus denying appellant due process guaranteed by the Ohio and
United States Constitutions.

[II.] Because appellant supported his new trial motion with evidence demonstrating substantive grounds for relief, the common Pleas court, in deciding appellants new trial motion without an evidentiary hearing, abused its discretion, Thus denying appellant due process guaranteed by the Ohio and United States Constitutions.

[III.] Appellant is entitled to a fair trial and to be tried without the newly discovered evidence of Nationwide Childrens Hospitals complete medical records and the Nursing Home complete medical records of I.C. is a denial of fundamental fairness and other rights as guaranteed by the United States Constitution.

[IV.] Trial court abused it's discretion and erred when it ruled appellants claim of ineffective assistance of trial counsels falure to investagate appellants case was barred by the doctrine of res judicata which denying appellants due process guaranteed by the Ohio and United States Constitutions.

[V.] Trial court abused it's discretion and erred in never entering judgement if appellant was unavoidably prevented from discovering Nationwide Childrens Hospitals complete medical records of I.C. which denying appellant due process guaranteed by the Ohio and United States Constitutions.

(Sic passim.)

*Id*. at *7.  On November 1, 2016, the appellate court affirmed the judgment of the trial court.  *Id*.

Petitioner apparently did not file an appeal.

On September 6, 2016, Petitioner filed this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He asserts that the evidence is constitutionally insufficient to sustain his conviction on felony murder (claim one); that he was denied a fair trial because the trial court failed to issue a jury instruction on the lesser-included offense of involuntary manslaughter (claim two); and that he was denied the effective assistance of trial counsel (claim three).  It is the position of the Respondent that Petitioner's claims are procedurally defaulted or without merit.

**Standard of Review**

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the

Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case.  The United

State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for

prisoners whose claims have been adjudicated in state court" and emphasized that courts must

not "lightly conclude that a State's criminal justice system has experienced the 'extreme

malfunction' for which federal habeas relief is the remedy."  *Burt v. Titlow*, 134 S. Ct. 10, 16

(2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559

U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-

court rulings, and demands that state court decisions be given the benefit of the doubt." (internal

quotation marks, citations, and footnote omitted)).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and

forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated

on the merits in State court proceedings" unless the state court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to be

correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of

> rebutting the presumption of correctness by clear and convincing
> evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006), *cert. denied*, 551 U.S. 1134 (2007)), *cert. denied sub nom. Coley v. Robinson*, 134 S. Ct. 513 (2013). The United States Court of Appeals for the Sixth Circuit has summarized these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L.Ed. 2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed. 2d 389.

*Id*. at 748–49. The burden of satisfying the AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

**Claim One:  Sufficiency of Evidence**

Petitioner asserts that the evidence is constitutionally insufficient to sustain his conviction on felony murder, in violation of O.R.C. § 2903.02(B),[1] because the State failed to establish that he caused I.C.'s death, which resulted from grossly negligent medical care.   The state appellate court rejected this claim, reasoning in relevant part as follows:

> [A]ppellant contends that the state failed to prove how the injuries were caused because no one observed appellant causing any harm to I.C., appellant was only home alone with I.C. for a short period of time, and that appellant never admitted abuse.  Although appellant is correct that the record contains no direct evidence of child abuse, appellant fails to appreciate that his convictions can be sustained based upon circumstantial evidence. *See State v. Jewett*, 10th Dist. No. 11AP–1028, 2013–Ohio–1246, ¶ 34, quoting *State v. Fausnaugh*, 10th Dist. No. 11AP–842, 2012–Ohio–4414, ¶ 26, quoting *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991) (" 'Under Ohio law * * * circumstantial evidence can have the same probative value as direct evidence, and "[a] conviction can be sustained based on circumstantial evidence alone." ' "); *State v. Hillman*, 10th Dist. No. 14AP–252, 2014–Ohio–5760, ¶ 44.
>
> Here, as discussed above, the state's witnesses provided circumstantial evidence to support the conclusion that I.C.'s injuries were the result of child abuse. Appellant contends that Dr. Young's testimony provided another plausible explanation for I.C.'s injuries. Although Dr. Young did advance another explanation for the injuries, the state's witnesses presented evidence that disputed the accuracy of Dr. Young's explanation. Dr. Martin stated that I.C.'s injuries would not have occurred while he was laying flat on his back while someone performed CPR on him. Dr. Leder stated that I.C.'s injuries were inconsistent with a fall from a bed 18 inches above a carpeted floor. Dr. Zumberge stated that a hypoxic ischemic injury, in which organs are deprived of oxygen as suggested by Dr. Young, was not consistent with the subdural hemorrhages found in I.C.'s brain. Dr. Leder also stated

---

[1] O.R.C. § 2903.02(B) provides:

> (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

that I.C.'s injuries were not consistent in any way with an episode wherein he stopped breathing and then started breathing again.

Although appellant contends that he was left alone with I.C. for a only [sic] short period of time, Dr. Adler stated that the evolution of I.C.'s injuries suggested that "the injury must have been shortly before the initial study" on February 12, 2012. (Tr. 328.) Dr. Zumberge concurred that the injury likely occurred within hours or a day of the initial CT scan based on the increased fluid around the brain between the time of initial head CT scan on February 12, 2012 and the MRI on February 13, 2012. Appellant offers no support in the record for his contention that his short time with I.C. would have rendered it impossible for him to commit abuse.

Finally, appellant contends that he did not violate a duty of care based upon the facts that he "was not a trained medical professional, that he attempted to get help by calling [I.C.'s] mother who was nearby, that he attempted CPR on I.C. after 911 was called, and that it was clearly established to be a panicked situation." (Appellant's Brief, 9.) However, appellant provides no support in the record for his contention that he did not violate a duty of care by never dialing 911 to summon help but, instead, waiting until I.C.'s mother returned home, at which time she summoned help by calling 911.

\*       \*       \*

[A]ppellant asserts that the evidence insufficiently supported his convictions.

Sufficiency of evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *Cassell* at ¶ 36, citing *Thompkins* at 386. When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id*. at 273.

In support of his assertion that his convictions for the two counts of child endangering and one count of murder were based upon insufficient evidence, appellant reiterates his contentions that "the

State's evidence against Appellant failed to address the important question of how Appellant could have caused the injuries" to I.C. and that "there were two plausible explanations" for I.C.'s injuries. (Appellant's Brief, 12.) Again, although the state did not present a direct explanation for appellant's injuries, the state offered circumstantial evidence to support the explanation that appellant abused I.C. thereby causing his injuries. Appellant fails to provide support with citation to pertinent legal authority or to the record for his contention that the evidence failed to support any element of the crimes for which he was convicted. As appellant merely rehashes the same argument he made in support of his contention that his convictions were against the manifest weight of the evidence and, further, fails to provide any support for his argument, we decline to consider it further. *White v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. No. 12AP–927, 2013–Ohio–4208, ¶ 11; *Lundeen v. State Med. Bd. of Ohio*, 10th Dist. No. 12AP–629, 2013–Ohio–112, ¶ 16.FN1

Accordingly, we overrule appellant's second assignment of error.

FN1:    Although appellant did not argue the same, we feel compelled to address the theory that I.C.'s death resulted from improper medical care instead of appellant's actions or failure to act. Even though I.C.'s peritonitis resulted from treatment administered by medical personnel, this is not sufficient to break the chain of causation. " 'It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.' " *State v. Carter*, 64 Ohio St.3d 218, 226 (1992), quoting *State v. Johnson*, 56 Ohio St.2d 35, 39 (1978). "Generally, 'one who inflicts injury upon another is criminally responsible for that person's death, regardless of whether different or more skillful medical treatment may have saved his life.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002–Ohio–2221, ¶ 45, quoting *Johnson* at 40. "[M]edical treatment for homicide victims is not an intervening cause" but, rather, "[o]nly gross negligence or willful maltreatment will relieve the defendant from liability. Simple negligence is not enough." *Hanna* at ¶ 45 (citations omitted). "The injuries inflicted by the defendant need not be the sole cause of death, as long as they constitute a substantial factor in the death." *State v. Beaver*, 119 Ohio App.3d 385, 394 (11th Dist.1997) (finding that, even if infection listed as one of four immediate causes of victim's death was the result of negligence of attending surgeons, it was not sufficient by itself to break the chain of direct causation). *See also State v. Wilson*, 10th Dist. No. 03AP–592, 2004–Ohio–2838, ¶ 15–41 (finding that jury could have rationally concluded that victim's death was the direct

and proximate result of defendant's actions where death in part resulted from prescribed drugs in her system nine months after defendant set her on fire).

Here, the state presented evidence that I.C.'s death was the natural and foreseeable result of appellant's actions. Dr. Lee stated that the "cause of death was complications of the peritonitis because of the fluid that was leaking into his belly secondary to him being in a chronic comatose state secondary to the head trauma." (Tr. 731.) Specifically, Dr. Lee testified that I.C. "would not have had the problems with his bowel and that fluid draining into his abdominal cavity if he didn't have that tube to feed him. The only reason he has a tube to feed him is because he can't chew or swallow himself. The only reason he can't chew and swallow himself is because of the head injury in the first place." (Tr. 732–33.) Even if I.C.'s death resulted in part from negligence of medical personnel administering treatment, this alone is not sufficient to break the chain of causation since nothing in the record reflects that I.C.'s death resulted from gross negligence or willful maltreatment. *Hanna* at ¶ 45. Thus, although I.C.'s death did not immediately follow from appellant's actions or inactions, there was sufficient evidence presented upon which the jury could rationally have concluded that appellant's actions were the direct and proximate cause of I.C.'s death. *Id.; Wilson* at ¶ 40; *Beaver* at 394.

*State v. Crockett*, 2015 WL 3757336, at *11-12.

Judge Tyack dissented, offering the following discussion:

TYACK, J., concurring in part and dissenting in part.

I respectfully dissent in part.

The injuries to this child were truly horrific. However, the child died as a result of the inadequate medical care given months after the initial injuries. The child's feeding tube became dislodged from his stomach and leaked fluid into his abdominal cavity. The dislodged feeding tube caused peritonitis. The peritonitis caused the child's death.

The jury which heard the case did not find that Johnnie Crockett, III knowingly caused serious physical harm to the child. The jury found Crockett not guilty of felonious assault. Instead, the jury found that Crockett was guilty of endangering the child in violation of R.C. 2919.22. This finding could well have been based in part on the fact that Crockett did not immediately seek medical help when he claimed he found the child not breathing. Instead, he called his wife, who came

home from shopping before medical assistance was sought. She was the one who called for help.

Although the evidence supported the child endangering convictions including the finding he recklessly abused the child, the evidence did not establish that the injuries the child suffered in February 2012 were a proximate cause of the death of the child in December 2012. The proximate cause of death of the child was the inadequate medical care the child received many months later and the inadequate monitoring of the child's medical condition months later. The fact the child was not receiving nutrition for an unknown period of time undoubtedly had several negative effects on the child. The fact the fluid which should have been nourishing the child was being dumped into the child's abdomen and causing inflammation of that area is the fact as to the actual cause of the death which occurred approximately ten months after the child was found not breathing.

The autopsy report on the child indicates that the gastric feeding tube in the child had perforated the peritoneal wall. The tube's tip was adjacent to the perforation but exposed to the peritoneal cavity. As noted earlier, the damage to the peritoneum was what caused the child's death. The earlier treatment of the child at Nationwide Children's Hospital did not reveal any harm to the peritoneum. All the harm to the peritoneum occurred at the facility which cared for the child after the child's discharge from Nationwide Children's Hospital.

I also note that the trial court judge told the jury:

Cause is an act or failure to act which in the natural and continuous sequence directly produces the injury, and without which it would not have occurred. Cause occurs when the injury is the natural and foreseeable result of the act or failure to act.

A death is the "proximate result" of an act or failure to act when it is produced directly by the act or failure to act in a natural and continuous sequence and would not have occurred without the act or failure to act. "Result" occurs when the death is naturally and foreseeably caused by the act or failure to act.

(Feb. 3, 2014 Jury Instructions, 5.)

The injury which caused the death of this child was the result of the improper medical care and treatment of the child ten months after Crockett and his wife contacted authorities. Such care was not a foreseeable result of any act or failure to act of Johnnie Crockett, III.

Therefore, I do not view the evidence as establishing that Crockett's actions or inactions proximately caused the damage to the child's peritoneum and therefore did not cause the death of the child. I would sustain the second assignment of

error in part. Sustaining the second assignment of error moots the first and third assignments of error.

*State v. Crockett*, 2015 WL 3757336, at *14-15.

Before a criminal defendant can be convicted consistent with the United States Constitution, there must be evidence sufficient to justify a reasonable trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In determining whether the evidence was sufficient to support a petitioner's conviction, a federal habeas court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, at 319). The prosecution is not affirmatively required to "rule out every hypothesis except that of guilt." *Id.* (quoting *Jackson*, 443 U.S. at 326). "[A] reviewing court 'faced with a record that supports conflicting inferences must presume—even if it does not appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, 443 U.S. at 326).

Moreover, federal habeas courts afford a "double layer" of deference to state-court determinations of the sufficiency of the evidence. As explained in *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009), *cert. denied*, 558 U.S. 1114 (2010), deference must be given, first, to the jury's finding of guilt because the standard, announced in *Jackson v. Virginia*, is whether "viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Second, and even if a *de novo* review of the evidence leads to the conclusion that no rational trier of fact could have so found, a federal habeas court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *See also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009), *cert. denied*, 562 U.S. 858 (2010). This is a substantial hurdle for a habeas petitioner to overcome. Petitioner has not done so.

Petitioner compares this case to factually dissimilar cases in arguing that the State failed to present sufficient circumstantial evidence to sustain his convictions. He complains that the State failed to produce any direct evidence of the cause of I.C.'s injuries, which resulted from a lack of oxygen to the brain and maintains that evidence established only an unknown, non-accidental head trauma. Petitioner further contends that his conviction requires the stacking of impermissible inferences, conjecture, and unreasonable speculation. Petitioner again argues that the child's injuries may have resulted from a prior fall and that he could not have caused I.C.'s injuries as he was alone with I.C. for only a brief period of time. In support of this claim, Petitioner refers to his acquittal on the charge of felonious assault. Petitioner also refers to Judge Tyack's dissenting opinion in this case, arguing that intervening grossly negligent medical care or damage to the peritoneum based on improper insertion of the gastric feeding tube caused the child's death, and not the injuries sustained as a result of his physical abuse. Petitioner characterizes the evidence as establishing that he made mistakes in administering CPR and failed to immediately call 911.

These arguments are not persuasive. Petitioner was convicted of the charge of felony murder, in violation of O.R.C. § 2903.02(B), by causing the death of I.C. as a proximate result of committing or attempting to commit an offense of violence, *i.e.*, child endangering. (Indictment, ECF No. 7-1, PAGEID # 115.)[3] Petitioner does not dispute the factual findings of the state appellate court. Those findings, as discussed, indicate, *inter alia*, that I.C. was in good health prior to the morning of February 12, 2012, when he stopped breathing while alone and in the sole care of the Petitioner. Petitioner did not seek immediate medical assistance when I.C. stopped breathing, but instead called the child's mother, who was at the store. She called 911 when she

---

[3] Petitioner does not challenge his convictions on two counts of child endangering, in violation of O.R.C. § 2919.22.

returned to the house. Experts, including Dr. David Rogers, Dr. Lisa Martin, Dr. Brent Adler, and Dr. Charles J. Lee, all concluded that the child's injuries were the result of abusive head trauma and inconsistent with other causes. Dr. Nicholas Zumberge said that it was nearly impossible to explain I.C.'s injuries in any manner other than child abuse, nonaccidental trauma, or abusive head injury. Dr. Mary Ranee Leder ruled out I.C.'s purported prior fall from the bed as a possible cause for the injuries that I.C. sustained. This testimony, when viewed in the light most favorable to the prosecution, is constitutionally sufficient to sustain Petitioner's conviction. "[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (sufficient evidence to sustain conviction on assault on a child resulting in death despite competing expert testimony on whether shaken baby syndrome caused death); *see also Butts v. Sheets*, No. 2:05-cv-994, 2006 WL 2612896, at *13-14 (S.D. Ohio Aug. 10, 2006) (circumstantial evidence sufficient to sustain convictions on murder, felonious assault, and child endangering despite conflicting expert testimony on the cause of death). Importantly, "circumstantial evidence alone can sustain a guilty verdict and . . . circumstantial evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). Additionally, "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (citing *Jackson*, 443 U.S. at 319). "[T]he only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 566 U.S. at 656. Moreover, habeas review of an appellate court's denial of a claim of insufficiency of the evidence is "twice-deferential." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).

The state appellate court rejected Petitioner's claim that he did not cause I.C.'s death in view of intervening improper medical care, holding that I.C.'s death was the natural and foreseeable result of Petitioner's actions, which caused I.C. to be placed in a comatose state due to the head trauma. This Court defers to, "and is bound by, the state appellate court's interpretation of Ohio law regarding the theories of natural consequences and intervening causes and their application[.]" *Spates v. Harris*, 1:16-cv-1262, 2017 WL 7792506, at *13 (N.D. Ohio Sept. 13, 2017) (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)).

Claim one is without merit.

**Claim Two: Improper Jury Instructions**

Petitioner asserts that he was denied a fair trial because the trial court refused to issue a jury instruction on the lesser-included offense of involuntary manslaughter. He argues that the appellate court's decision denying this claim involved an unreasonable determination of the facts in light of the trial record, because, according to Petitioner, he presented sufficient evidence to warrant the lesser-included jury instruction, particularly in view of the jury's verdict of not guilty on the charge of felonious assault. The appellate court denied the claim as follows:

> [A]ppellant asserts that the trial court erred by failing to instruct the jury on the lesser-included offense of involuntary manslaughter.
>
> "An offense is a lesser-included offense of another where: (1) the offense carries a lesser penalty; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove commission of the lesser offense." *State v. Hubbard,* 10th Dist. No. 11AP–945, 2013–Ohio–2735, ¶ 37, citing *State v. Deem*, 40 Ohio St.3d 205, 209 (1988).
>
> Appellant was charged with felony murder under R.C. 2903.02(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to

commit an offense of violence that is a felony of the first or second degree." Because appellant was acquitted of the felonious assault charge, his felony murder conviction was predicated on the felony two count of endangering children under R.C. 2919.22(B)(1), as felony murder requires a first or second-degree felony as the predicate offense. *See Hubbard* at ¶ 20. R.C. 2919.22 provides that it is a felony of the second degree to abuse a child under 18 years of age where such abuse results in serious physical harm to the child.

R.C. 2903.04 defines the crime of involuntary manslaughter and provides that no person shall cause the death of another "as a proximate result of the offender's committing or attempting to commit a felony," or as the result of the offender committing or attempting to commit "a misdemeanor of any degree." R.C. 2903.04(A) and (B). Appellant asserts that the felony three count of endangering children could have served as the predicate felony for his involuntary manslaughter instruction since any felony or misdemeanor can be the predicate offense for involuntary mansalughter [sic]. *See Hubbard* at ¶ 20. R.C. 2919.22(A) provides that "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22(E)(2)(c) provides that a violation of R.C. 2919.22(A) that results in serious physical harm to the child involved is a felony of the third degree.

Here, there is no question that involuntary manslaughter is a lesser-included offense of felony murder. *State v. Lynch*, 98 Ohio St.3d 514, 2003–Ohio–2284, ¶ 79; *State v. Finley*, 1st Dist. No. C–061052, 2010–Ohio–5203, ¶ 29; *State v. Brundage*, 1st Dist. No. C–030632, 2004–Ohio–6436, ¶ 9 ("[I]nvoluntary manslaughter under both R.C. 2903.04(A) and (B) is a lesser-included offense of felony murder."). However, a court is required to give an instruction on a lesser-included offense only when " 'sufficient evidence is presented which would allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included * * * offense.' " (Emphasis sic.) *Hubbard* at ¶ 37, quoting *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). *See also State v. Noor*, 10th Dist. No. 13AP–165, 2014–Ohio–3397, ¶ 80. In other words, a trial court "must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *State v. Wine*, 140 Ohio St.3d 409, 2014–Ohio–3948, ¶ 34. *See also State v. Wilkins*, 64

Ohio St.2d 382, 388 (1980). "In determining whether lesser-included-offense instructions are appropriate, 'the trial court must view the evidence in the light most favorable to the defendant.'" *Wine* at ¶ 21, quoting *State v. Monroe*, 105 Ohio St.3d 384, 2005–Ohio–2282, ¶ 37.

"As is the case when reviewing a trial court's jury instructions generally, the proper standard of review for an appellate court in reviewing whether to give an instruction as to a lesser-included offense is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *Noor* at ¶ 81, citing *State v. Parnell*, 10th Dist. No. 11AP–257, 2011–Ohio–6564, ¶ 21–27. Abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

In this case, the appellant argued that a lesser-included-offense instruction was appropriate because "[t]here is F3 available to the jury already, F3 child endangering. So involuntary manslaughter could be predicated upon that F3. I would argue that the jury's been presented with a range of evidence. They will be determining the knowingly, recklessly element, and they could come to this decision." (Tr. 753–54.) In response, the state offered the following argument:

[Assistant Prosecutor]: * * * There's been no evidence that indicates it should be given in this case. The defense's theory is that he is innocent, that he did not commit these crimes. That's not the kind of defense that warrants a lesser in this situation.

The only witness that was offered by the defense testified to alternate causation aside from what the state's theory was.

\*   \*   \*

The theory of the cause of death is from abuse. It's not from lack of attention. Now, that may have happened as well. But there isn't any evidence of that lack of attention of that violation of duty of care is the cause of death in this case.

(Tr. 754, 756.) The trial court overruled appellant's request for a lesser-included-offense instruction but warned the state to only argue that the cause of death was from abuse. Appellant renewed his objection to lack of the involuntary manslaughter instruction.

Here, even viewing the evidence in a light most favorable to appellant, no reasonable jury could acquit appellant of felony murder but convict him of involuntary manslaughter. Although some evidence in the form of Dr. Young's testimony was offered at trial to support a finding that appellant did not commit child abuse, the jury clearly rejected such evidence in finding appellant committed abuse of a child in violation of R.C. 2919.22(B). Because the jury found appellant guilty of child abuse resulting in serious physical harm, it would be unreasonable for the jury to believe that the child's death resulted from the child endangering arising from a violation of a duty of care under R.C. 2919.22(A).

Our conclusion is supported by both the content and quality of evidence in the record. The record contains an abundance of evidence supporting the conclusion that appellant's abuse caused I.C.'s injuries, which ultimately resulted in his death. Dr. Zumberge concluded that it was "difficult to explain or nearly impossible to explain" I.C.'s injuries, specifically "retinal hemorrhages, subdural hemorrhages, and diffuse brain injury," in any manner other than "child abuse or nonaccidental trauma or abusive head injury, whatever term is used." (Tr. 432.) Dr. Rogers agreed that, based on his examination of I.C.'s eyes and his associated medical history, the injuries resulted from abusive head trauma. Dr. Lee stated that his findings resulting from I.C.'s autopsy were consistent with abusive head trauma. Dr. Leder concluded that no medical condition or accidental history could explain the presence of I.C.'s injuries, and that his injuries were consistent with a finding of nonaccidental trauma. Thus, although the state's witnesses considered other possible explanations for I.C.'s injuries, they found no evidence to support any conclusion other than that the injuries resulted from child abuse. On the other hand, the record does not reflect, and appellant fails to point to, evidence demonstrating that appellant's failure to summon help was the cause of I.C.'s injuries, or, ultimately, of his death.

Therefore, although appellant presented some evidence that would support the lesser-included-offense instruction, we find that such evidence was not sufficient to allow the jury to reasonably reject the greater offense and support the lesser-included offense. *See State v. Trimble*, 122 Ohio St.3d 297, 2009–Ohio–2961, ¶ 192, citing *State v. Shane*, 63 Ohio St.3d 630, 632 (1992) ("The lesser-included-offense instruction is not warranted every time 'some evidence' is presented to rsupport the lesser offense.").

Appellant asserts that, contrary to the state's arguments both at the trial level and on appeal, the Supreme Court of Ohio in *Wine* found that a defendant's trial strategy was irrelevant to the determination of whether or not a lesser-included-offense instruction was appropriate. In *Wine,* the Supreme Court considered "whether a defendant who presents an 'all or nothing' defense in a criminal trial has the right to prevent a trial court from giving lesser-included-offense jury instructions." *Id.* at ¶ 1. The Supreme Court held that "[t]he trial court, after reviewing the evidence, determines whether an instruction on lesser included offenses is appropriate" and that "[t]he trial court must give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *Id.* at ¶ 34. While appellant is correct that the Supreme Court also stated that "[t]his court has therefore left no doubt that it is the quality of the evidence offered, not the strategy of the defendant, that determines whether a lesser-included-offense charge should be given to a jury," this does not alter our conclusion that no reasonable jury could acquit appellant of felony murder but convict him of involuntary manslaughter. *Id.* at ¶ 26. Regardless of whether or not the trial court considered the state's argument regarding appellant's trial strategy in making its determination, the trial court correctly determined that a lesser-included-offense instruction was not warranted in this instance.

Thus, under the facts and circumstances of the case at hand, we cannot find that the trial court abused its discretion by refusing to provide the requested jury instruction. *Noor* at ¶ 81. Accordingly, we overrule appellant's third assignment of error.

*State v. Crockett*, 2015 WL 3757336, at *7-10.

This claim fails to provide Petitioner a basis for relief. "Under AEDPA, a threshold issue is to determine whether there is 'clearly established' law governing the case." *Belton v. Woods*, No. 5:16-cv-10647, 2017 WL 2132245, at *3 (E.D. Mich. May 17, 2017) (citing *Carey v. Musladin*, 549 U.S. 70, 74-77 (2006)). "Law is 'clearly established' when Supreme Court precedent unambiguously provides a 'controlling legal standard.'" *Id.* (citing *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)). The Supreme Court has not held that the Constitution

provides a criminal defendant in a non-death penalty case the right to a jury instruction on a lesser-included offense:

> The right to an instruction on a lesser-included offense in a noncapital case has not been clearly established by the Supreme Court. *See Parker v. Burt*, 595 Fed. Appx. 595, 605 (6th Cir. Mich. 2015). The Sixth Circuit stated, "[t]he Supreme Court ... has never held that the Due Process Clause requires instructing the jury on a lesser included offense in a non-capital case." *McMullan v. Booker,* 761 F.3d 662, 667 (6th Cir. 2014); *see also Campbell v. Coyle,* 260 F.3d 531, 541 (6th Cir. 2001) ("[T]he Constitution does not require a lesser-included offense instruction in non-capital cases.") (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc)).

*Belton v. Woods*, 2017 WL 2132245, at *4. Thus, "[t]he failure of a state trial court to instruct a jury on a lesser included offense in a non-capital case is [] not an error cognizable in federal habeas review." *Robinson v. Winn*, No. 4:16-cv-11738, 2018 WL 1522437, at *7 (E.D. Mich. March 28, 2018) (citing *Bagby v. Sowders*, 894 F. 2d 792, 797 (6th Cir.), *cert. denied*, 496 U.S. 929 (1990); *Scott v. Elo*, 302 F. 3d 598, 606 (6th Cir. 2002), *cert. denied*, 537 U.S. (2003)).

> In the absence of a further Supreme Court decision on this matter, a state court determination of whether instructions on lesser-included offenses were necessary cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent; and thus, falls beyond the authority of a habeas court. *See McMullan v. Booker*, 761 F.3d 662, 667 (6th Cir. 2014); *Tegeler v. Renico*, 253 Fed.Appx. 521, 525 (6th Cir. 2007) (where an open question exists in Supreme Court jurisprudence as to a particular issue of law, no violation of "clearly established" federal law as determined by the Supreme Court can be shown).

*Howard v. Dewine*, No. 5:14-cv-2587, 2016 WL 2637757, at *8 (N.D. Ohio April 6, 2016). Thus, any error in jury instructions will only provide relief where the ailing instruction so infected the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 135, 154 (1977) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Such are not the circumstances here. "An omission, or an incomplete instruction, is less likely to be prejudicial

than a misstatement of the law." *Id.* at 155. The appellate court reasonably concluded that the facts did not support an instruction on the lesser-included offense of involuntary manslaughter in view of the lack of any evidence indicating that I.C. died as a result of Petitioner's failure to seek immediate medical assistance.

Claim two is without merit.

**Claim Three: Ineffective Assistance of Counsel**

**Procedural Default**

Respondent contends that Petitioner has procedurally defaulted his claim of the denial of the effective assistance of counsel by failing to present this issue to the Ohio Supreme Court. For the reasons that follow, this Court agrees.

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6, 103 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas . . . ." *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This requires the petitioner to present "the same claim under the same theory" to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case; that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, the Court must determine whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that

the petitioner did not comply with a state procedural rule and that the rule was an adequate and independent state ground, then the petitioner must demonstrate cause for his failure to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir*.), cert. denied sub nom. Leroy v. Morris,* 474 U.S. 831 (1985).

In light of the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Id.* at 452 (quoting *Murray*, 477 U.S. at 479). That is because before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir.), *cert. denied*, 546 U.S. 1017 (2005). Or, if the claim is procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards,* 529 U.S. at 450–51. The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the

States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S. Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." *Id.* at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (quoting *id.,* at 853, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by " 'letting the time run' " so that state remedies were no longer available. *Id.* at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].' " *Id.* at 854, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L.Ed. 761 (1950)).

*Id.* at 452–53.

If, after considering all four factors of the *Maupin* test, the Court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray*, 477 U.S. at 495–96), *cert. denied*, 135 S. Ct. 1545 (2015).

Here, Petitioner argued that he was denied the effective assistance of counsel in the Ohio Court of Appeals; however, he failed again thereafter to raise this same issue on appeal to the Ohio Supreme Court.  (*See* Mem. in Support of Jurisdiction, ECF No. 7-1, PAGEID # 259.) Further, he may now no longer do so, due to Ohio's doctrine of *res judicata.  See State v. Cole*, 2

Ohio St. 3d 112, 115 (1982); *State v. Perry*, 10 Ohio St. 2d 175, 180 (1967) (claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata*.). The state courts were never given an opportunity to enforce this procedural rule due to the nature of Petitioner's procedural default.

Ohio's doctrine of *res judicata* is adequate and independent under the third part of the Maupin test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman*, 501 U.S. at 732–33. To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia*, 498 U.S. 411, 423 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id*. (quoting *James v. Kentucky*, 466 U.S. 341, 348–351 (1984)); *see also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964). The United States Court of Appeals for the Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e*., the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001), *cert. denied sub nom. Coleman v. Bagley,* 535 U.S. 1031 (2002); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000), *cert. denied*, 532 U.S. 989 (2001); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000) *cert. denied*, 531 U.S. 1082 (2001); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.), *cert. denied,* 525 U.S. 935 (1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of claims because they are procedurally barred. *See Cole*, 2 Ohio St.3d at 112; *State v. Ishmail*, 67 Ohio St.2d 16, 18 (1981). Additionally, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the

earliest possible opportunity. With respect to the independence prong, the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or otherwise implicate federal law. Accordingly, the Court is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief.

Petitioner therefore has procedurally defaulted his claim of the denial of the effective assistance of counsel. He may still secure review of this claim on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the alleged constitutional violations. "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir.), *cert. denied*, 543 U.S. 989 (2004). Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), *cert. denied sub nom. Hartman v. Bobby*, 554 U.S. 924 (2008). Further, attorney error cannot constitute cause for Petitioner's failure to raise an issue in the Ohio Supreme Court where Petitioner had no right to counsel in such proceeding. *See Barkley v. Konteh*, 240 F. Supp. 2d 708, 713-14 (N.D. Ohio Dec. 13, 2002) (citing *Coleman*, 501 U.S. at 751-53; *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987))(other citations omitted). Petitioner has failed to establish cause for his procedural default.

Claim three is waived.

**Recommended Disposition**

For the reasons set forth above, it is **RECOMMENDED** that this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE